IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE,
AT COOKEVILLE

| | |
|---|---|
| **DONNA FAYE HUGHES,** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | No. 2:18-cv-00057 |
| ) | JURY DEMAND |
| **RIVERVIEW MEDICAL CENTER, LLC,** ) | |
| ) | |
| *Defendant.* ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
FILED BY RIVERVIEW MEDICAL CENTER, LLC**

---

Pursuant to Fed R. Civ. P. 56, Defendant Riverview Medical Center, LLC ("Riverview Medical Center") files this Memorandum of Law in Support of its Motion for Summary Judgment.

Plaintiff's claim involves her care and treatment in the Emergency Department at Defendant Riverview Regional Medical Center on December 24, 2017. Plaintiff alleges that Defendant should have recognized that Plaintiff had an emergency medical condition and should have promptly performed surgery instead of discharging her. However, this type of claim is covered under state medical malpractice law, not EMTALA. Yet, Plaintiff pled no state law claims in her First Amended Complaint, and the statute of limitations for any claim for malpractice against Defendant has passed. *See* Tenn. Code Ann. § 29-26-116.

Therefore, Plaintiff's sole cause of action in her First Amended Complaint is for alleged violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C.

1

§ 1395dd (EMTALA). Plaintiff alleges only one violation of EMTALA—that Defendant "failed to stabilize Mrs. Hughes' emergency medical condition."[1] EMTALA only requires that a Defendant stabilize a patient if the Defendant has actual knowledge of the emergency medical condition. *Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 786 (6th Cir. 2003). It is undisputed that the Defendant did not have actual knowledge that Plaintiff's condition was an emergency medical condition.

Not only are Plaintiff's claims barred by the one year statute of limitations for healthcare liability actions, but after completing discovery, Plaintiff is not able to meet her burden of proof for her stabilization claim under EMTALA, and her First Amended Complaint should be dismissed with prejudice.

**FACTS**

On December 24, 2017, Plaintiff Donna Hughes presented to the emergency room at Riverview Medical Center at 10:52 a.m., complaining of a right arm injury after a fall. (Ford Depo., at 9, 12). She was seen and attended to by Dr. Charles D. Ford, Jr., the emergency room physician at Riverview Medical Center. (Ford Depo., at 14). Dr. Ford performed a complete, physical exam on Mrs. Hughes to ensure he had not missed any injury since Mrs. Hughes had complained of a fall. (Ford Depo., at 17). He determined her right bicep showed deformity, pain, swelling, and tenderness, with a limited range of motion due to pain. (Ford Depo., at 18). As a result, Dr. Ford ordered a two-view x-ray of the humerus, as well as narcotic and anti-steroidal pain medication, and an ice pack

---

[1] While the First Amended Complaint does reference the screening requirement in EMTALA, Plaintiff has not alleged that Defendant violated that requirement, and the Initial Case Management Order in this case reflects that Plaintiff's only claim against Defendant is that Defendant "failed to stabilize" Plaintiff's condition. (DE 17, PageID# 46-47).

2

for Mrs. Hughes. (Ford Depo., at 22). The x-ray revealed that Mrs. Hughes had a displaced midshaft fracture of her right humerus. (Ford Depo., at 29). After reviewing the x-ray, Dr. Ford ordered a sling in order to immobilize her arm and ordered Mrs. Hughes to follow up with Dr. Roy Terry, an orthopedic surgeon, in five to six days. (Ford Depo., at 25-27). Dr. Ford determined Mrs. Hughes was stable and ready for discharge due to the fact that she was neurovascularly intact with a closed fracture and had a device to immobilize her extremity. (Ford Depo., at 28, 29). Based on his examination and treatment, Dr. Ford concluded that no material deterioration of Mrs. Hughes' condition was likely to result between the time of discharge and when she was instructed to see Dr. Terry and that her injury had been stabilized. (Ford Depo., at 32).

Plaintiff alleges that, at some point while she was at Riverview Medical Center, Dr. Ford or an employee of Riverview Medical Center spoke with Dr. Roy Terry, an orthopedic surgeon. (DE 29, PageID# 106). Plaintiff alleges that Dr. Terry wanted to admit Plaintiff to the hospital so "prompt surgical intervention" could be had for an open reduction of the displaced fracture. (DE 29, PageID# 106-07). However, Plaintiff has been unable to provide any admissible evidence in support of these allegations. In his deposition, Dr. Terry testified that not only was Mrs. Hughes medically stable at discharge but that he never told Dr. Ford or any agent or employee of Riverview Medical Center to admit Mrs. Hughes for surgery on December 24, 2017. (Terry Depo., at 66-68, 71). Plaintiff has no admissible evidence to support her allegation that Dr. Terry notified Riverview Medical Center that Mrs. Hughes had an emergency medical condition that was not stabilized prior to her discharge.

On January 19, 2018, almost a month after Plaintiff initially presented to the emergency room, Dr. Terry performed an open reduction, which required placement of a rod through the humerus. (Terry Depo., at 90-91). Her vital signs were stable prior to surgery; however, after the rod had been placed in her arm, Dr. Terry observed significant bleeding in her arm and became concerned that she had suffered an arterial injury. (Terry Depo., at 91). Plaintiff was transferred to another hospital—Tennova Healthcare in Lebanon, Tennessee—to have additional surgery to have her brachial artery repaired by a vascular surgeon. (Terry Depo., at 92; Stillwell Depo., at 32). She required multiple units of blood both before surgery and upon arrival. (Terry Depo., at 91).

Plaintiff alleges that this exacerbation of her injury was sustained by the "failure to stabilize the displaced fracture through a prompt open reduction." (DE 29, PageID# 108). Plaintiff further alleges that the pain, suffering, and sustained injury were reasonably foreseeable at the time of her discharge on December 24, 2017 from Riverview Medical Center. (DE 29, PageID# 108-09). Plaintiff filed her Complaint in the Middle District of Tennessee on July 9, 2018, alleging that the decision to discharge her without first performing surgery constituted a "failure to stabilize" an emergency condition as required under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C.A. § 1395dd(b).

On January 11, 2019, Defendant Riverview Medical Center filed a Motion for Judgment on the Pleadings (DE 19) arguing that Plaintiff's Complaint did not state a claim under EMTALA as Plaintiff did not allege that the hospital had knowledge that Plaintiff had an emergency medical condition and that Plaintiff's claims were really a medical malpractice claim for state law negligence, not a claim under EMTALA. In response,

Plaintiff asked for permission to amend their Complaint in order to correct the deficiencies in their Complaint identified in Defendant's Motion for Judgment on the Pleadings. (DE 24). The Court granted Plaintiff's Motion to Amend their Complaint, and the First Amended Complaint was filed on March 14, 2019. (DE 29).

The Parties have now conducted extensive discovery. At the conclusion of discovery, the Plaintiff has still been unable to provide any admissible evidence to prove her claim. In short, there is no genuine issue of material fact as to the Defendant's knowledge of the existence of an emergency medical condition upon discharge. In addition, Plaintiff's treating physician, who is Plaintiff's only expert, has testified that Plaintiff was medically stable and did not have an emergency medical condition upon discharge. In sum, Plaintiff cannot prove her EMTALA claim against the Defendant, and her claim should be dismissed with prejudice.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides in part that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The Advisory Committee for the Federal Rules has noted that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56 advisory committee's note.

Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247–48 (1986). A genuine

5

Case 2:18-cv-00057   Document 41   Filed 03/23/20   Page 5 of 20 PageID #: 152

issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. *Anderson*, 477 U.S., at 247-48. The substantive law involved in the case will underscore which facts are material, and only disputes over outcome-determinative facts will bar a grant of summary judgment. *Anderson*, 477 U.S., at 248.

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986). In ruling on a motion for summary judgment, the court must review the facts and reasonable inferences to be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine if a summary judgment motion should be granted, the court should use the standard it would apply to a motion for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. *Anderson*, 477 U.S. at 250. The court must determine whether a reasonable jury would be able to return a verdict for the non-moving party and if so, the court must deny summary judgment. *Id.* at 249. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989) (citations omitted).

# ARGUMENT

## I. Plaintiff does not have sufficient proof to support her EMTALA claim.

The Sixth Circuit has held that EMTALA imposes upon hospitals the following duties: (1) to provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to any individual who comes to the emergency department and seeks examination and treatment; and (2) <u>if the hospital determines that the individual has an emergency medical condition</u>, to stabilize the medical condition before transferring or discharging a patient. *Cleland v. Bronson Healthcare Group, Inc.*, 917 F.2d 266, 268 (6th Cir.1990). The statute was not designed or intended to establish guidelines or standards for patient care, provide a suit for medical negligence, or substitute for a medical malpractice claim. *Moses v. Providence Hosp. and Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir.2009).

Plaintiff's First Amended Complaint is limited to the second prong of EMTALA — stabilization. This section of EMTALA has a two-part requirement: (1) the hospital determines there is an emergency medical condition and (2) the hospital must stabilize the medical condition before transferring (or discharging) the patient. For the stabilization and transfer requirements to apply, the hospital must first determine that the individual has an emergency condition. *Broughton v. St. John Health System*, 246 F.Supp.2d 764, 773 (E.D. Mich. 2003). In order to require stabilization, "the hospital physicians must actually recognize that the patient has an emergency medical condition; if they do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply." *Moses*, 561 F.3d at 585; *see also Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir.2003).

EMTALA defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual ... in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). "To stabilize" a patient with such an "emergency medical condition" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). "Transfer" is defined in the statute to include moving the patient to an outside facility or discharging her. 42 U.S.C. § 1395dd(e)(4).

What must be shown to trigger the stabilization obligation contained in § 1395dd(b), is that a hospital (including any of its agents or employees) have actual knowledge that an emergency medical condition existed. *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 585 (6th Cir.2009) (citing *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir.2003)). In *Moses*, the Sixth Circuit expressly stated that <u>"if [hospital staff members] do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply."</u> 561 F.3d at 585 (citing *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir.2003)) (emphasis added). ("[I]n order to trigger further EMTALA obligations, the hospital physicians must actually recognize that the patient has an emergency medical condition; if they do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply."); *Cleland*, 917 F.2d at 271

(footnote omitted) ("If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition."); *Urban ex rel. Urban v. King*, 43 F.3d 523, 526 (10th Cir.1994) ("The statute's stabilization and transfer requirements do not apply until the hospital determines the individual has an emergency medical condition."). Thus, only actual knowledge of an emergency medical condition on the part of a hospital's staff—not simply the existence of facts that should have put defendant on notice—triggers a duty to stabilize a patient pursuant to § 1395dd(b) of EMTALA. *Burd v. Lebanon HMA, Inc.*, 756 F.Supp.2d 896, 906 (M.D.Tenn.2010) (finding that because the hospital diagnosed the patient with acute anxiety and determined he was stable, it did not have actual knowledge of an emergency medical condition, despite that the patient had been admitted to the same hospital that morning for attempted suicide by hanging and the police officer who brought him in that evening informed the hospital that the patient had threatened to kill himself).

Any hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA. *Moses*, 561 F.3d at 585. However, simply alleging that a patient's condition was rapidly deteriorating when discharged is not sufficient to state a claim under the stabilization requirement of EMTALA, unless it is also alleged that the hospital knew that it was. *See* 42 U.S.C. § 1395dd(b); *Cleland*, 917 F.2d at 269, 272. Analysis by hindsight is not sufficient to impose liability under EMTALA. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 883 (4th Cir.1992). Instead, a hospital must actually perceive the seriousness of the medical condition and nevertheless fail to act to stabilize it. Here, Plaintiff has not satisfied her burden of showing the hospital had knowledge of her alleged emergency condition or

9

Case 2:18-cv-00057   Document 41   Filed 03/23/20   Page 9 of 20 PageID #: 156

even that Plaintiff had an emergency medical condition at the time of discharge, and her EMTALA claim should be dismissed.

### A. Under EMTALA, Plaintiff is required to prove that Riverview Medical Center actually knew she had an emergency medical condition.

The Sixth Circuit "has long held that liability under section (b) requires actual knowledge of the condition. Section (b) explicitly states that the duty to stabilize patients only arises when 'the hospital determines that the individual has an emergency medical condition.' " *Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 786 (6th Cir. 2003).

To the extent a plaintiff alleges that the hospital should have detected an emergency medical condition, but failed to do so, that is an issue Congress left for state medical malpractice law; it is not an EMTALA claim. "In order to trigger further EMTALA obligations, the hospital physicians must actually recognize that the patient has an emergency medical condition; if they do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 585 (6th Cir. 2009).

Thus, the Court need not decide whether the Plaintiff, contrary to the assessments of Dr. Ford or Dr. Terry, had an emergency medical condition on discharge. Nor does the Court need to determine if the hospital should have detected an emergency medical condition upon discharge on December 24, 2017. The only issue is whether the hospital did detect, i.e. whether the hospital had actual knowledge, that the Plaintiff had an emergency medical condition on discharge on December 24, 2017 but discharged her anyway.

**B. Plaintiff's treating physician at Riverview Medical Center had no actual knowledge that she had an emergency medical condition at the time of her discharge.**

Upon her presentation to the emergency room at Riverview Medical Center on December 24, 2017, the Plaintiff was examined by Dr. Ford who determined that Plaintiff had a displaced fracture of the humerus. He treated her fracture with a sling and ordered her to follow up with a specialist. After treatment, he determined she was stable at the time of discharge. (Ford Depo., at 28).

> Q. […] [H]ow can someone with a fracture of their humerus be stable from an emergency department physician's perspective, how is it that you were able to come to that conclusion?
>
> A. Based on the physical exam of the patient being neurovascularly intact and the fact that the fracture was not open. It was a closed fracture, meaning the bone wasn't through the skin, and the patient had had device applied to immobilize the extremity. And then with all patients I look at their vital signs before discharge.
>
> Q. When you say the patient was "neurovascularly intact," explain […] what that means.
>
> A. That means that past the injury the patient has good pulses; good capillary refill, which means when you push on the finger and it turns white and goes back to red quickly; and then no deficit in either sensory or motor function of the extremity.

(Ford Depo., at 29).

Based on Dr. Ford's physical examination, he concluded that he had stabilized the Plaintiff's injury, that she was stable upon discharge, and that she did not have an emergency medical condition upon discharge.

> Q. […] [D]id you reach a conclusion within a reasonable medical probability that no material deterioration of Mrs. Hughes' condition was likely to result between the time of discharge and the time that she was instructed to see the specialist, Dr. Terry?
>
> A. Yes.

11

> Q. And was it your conclusion based upon your examination and your treatment to a reasonable degree of medical probability that Mrs. Hughes was indeed stable and stabilized by you during your visit at the time of her discharge.
>
> A. Yes.

(Ford Depo., at 32)

While the Defendant only needs to show it did not have actual knowledge of Plaintiff's emergency medical condition at the time of discharge and not that the Plaintiff did not actually have an emergency medical condition, it is worth noting that Plaintiff's treating physician and expert, Dr. Terry, agreed with Dr. Ford's assessment that Plaintiff was stable upon discharge:

> Q. In your opinion, was she unstable at the time of discharge?
>
> A. No. She was not unstable.
>
> Q. Did she have an emergency medical condition at the time of discharge on December 24, 2017, if you know?
>
> A. I'm going to say no to that.

(Terry Depo., at 71).

> Q. […] [W]as Ms. Hughes medically unstable when she was discharged from the emergency department on December 24, 2017?
>
> A. No, ma'am.

(Terry Depo., at 83).

> Q. […] You said that she was medically stable or agreed with the question that she was medically stable. What does that mean?
>
> A. It means that – to me, it means that the patient's vital signs are stable. They're not in imminent threat of dying and that, you know, there's – that's acceptable.

12

(Terry Depo., at 97). Accordingly, while Dr. Terry's judgment is not relevant to an EMTALA claim, Plaintiff's EMTALA claim is so tenuous that even her own expert was not able to criticize the medical judgment of Dr. Ford in the instant case.

It is undisputed that Dr. Ford, Plaintiff's treating emergency physician at Riverview Medical Center, did not have actual knowledge Plaintiff had an emergency medical condition at the time of her discharge. In addition, Plaintiff's own expert has testified that in his opinion, the Plaintiff was stable and did not have an emergency medical condition at the time of discharge. In sum, there are no genuine issues of material fact that Dr. Ford, Mrs. Hughes' treating physician at Riverview Medical Center, had actual knowledge that she had an emergency medical condition at the time of discharge.

### C. Despite Plaintiff's allegations in her First Amended Complaint, no employee or agent of Riverview Medical Center had actual knowledge that Plaintiff had an emergency medical condition at the time of discharge.

The crux of Plaintiff's stabilization claim in the First Amended Complaint is that "[b]ecause of Plaintiff's emergency medical condition, the referred orthopedic surgeon, Dr. Roy Terry offered to perform the open reduction of the humerus without charge but the Defendant [] refused to provide access to the operating room because of the Plaintiff's lack of medical insurance." (DE 29, PageID# 107). Plaintiff argues that this surgery "needed to be performed on December 24, 2017 to stabilize the Plaintiff's emergency medical condition" and that the failure to do so "endangered the life of the Plaintiff." (DE 29, PageID# 107). Not only has Plaintiff failed to prove she had an emergency medical condition at the time of discharge, as discussed above, but deposition testimony in this case fails to support any of Plaintiff's allegations that Dr. Terry, the referred orthopedist,

13

notified staff at Riverview Medical Center that Mrs. Hughes needed emergency surgery to stabilize her fracture prior to discharge.

Dr. Terry testified that after receiving information about Mrs. Hughes' injury from Dr. Ford, he called the hospital and was told Mrs. Hughes was already leaving the hospital. He never told Dr. Ford or any agent or employee of Riverview Medical Center to admit Mrs. Hughes to the hospital for immediate emergency surgery.

> Q. The one phone call, though, was – when you called, you were told that she was already leaving?
>
> A. Yes, ma'am.
>
> Q. Did you send a text message to Dr. Ford to admit the patient immediately to the hospital?
>
> A. No, ma'am.

(Terry Depo., at 66).

> Q. […] [Y]ou didn't tell him that you were – to admit the patient, correct?
>
> A. No, ma'am.
>
> Q. I am correct?
>
> You did not –
>
> A. You asked me I did not admit – ask for her to be admitted, and I said, "Yes, ma'am, that's correct."

(Terry Depo., at 67-68).

There is no admissible evidence disputing Dr. Terry's testimony that he did not order Mrs. Hughes to be admitted to Riverview Medical Center for surgery on December 24, 2017, and accordingly, there is no admissible evidence to support Plaintiff's allegation that Riverview Medical Center had actual knowledge that Mrs. Hughes had an emergency medical condition and refused her treatment.

14

### D. Summary judgment is proper on Plaintiff's stabilization claim.

As discussed in more detail below, this is not an EMTALA claim but instead a medical malpractice claim, which rests on Plaintiff's allegation that Dr. Ford should have chosen a different course of treatment by admitting her promptly for surgery and that she could not "reasonably have been expected to have been 'stable' in her condition upon discharge" from Riverview Medical Center. Whether Plaintiff was actually "stable," however, is not relevant to an EMTALA claim. As discussed above, even if Plaintiff were not "stable" upon discharge, the only relevant inquiry in an EMTALA case is whether Defendant had knowledge of the emergent condition.

It is undisputed that neither Mrs. Hughes' treating physicians, nor any agents or employees of Riverview Medical Center, had actual knowledge that she had an emergency medical condition upon discharge from the emergency department on December 24, 2017. Plaintiff has failed to produce any admissible evidence that would show that Riverview Medical Center failed to stabilize her emergency medical condition prior to discharge on December 24, 2017, and there are no genuine issues of material fact as to the Defendant's actual knowledge of Plaintiff's emergency medical condition prior to discharge. Accordingly, Plaintiff cannot meet her burden of proof in her claim, and her First Amended Complaint must be dismissed with prejudice.

## II. Plaintiff's EMTALA claim is a medical malpractice claim, which is barred by the statute of limitations and the Tennessee Medical Malpractice Act.

Plaintiff has made numerous allegations that are critical of the care that Dr. Ford and Riverview Medical Center provided to her. However, this type of claim is not covered under EMTALA. It is instead a state law medical malpractice claim, although Plaintiff's First Amended Complaint contains no state law claims. Accordingly, as of the filing of

15

this dispositive motion, any potential medical malpractice claims Plaintiff has are barred by the Tennessee Medical Malpractice Act and the statute of limitations.

### A. Plaintiff's claim is a healthcare liability action,[2] which is not covered under EMTALA.

Plaintiff's claim, in essence, is that Dr. Ford did not act reasonably in his diagnosis and treatment and discharge of Mrs. Hughes. She alleges that Dr. Ford should have known that her condition was not stable on discharge and that he should have promptly admitted her for surgery. However, these allegations constitute a claim for medical malpractice, not a claim under EMTALA. Not infrequently, plaintiffs attempt to bring claims under EMTALA that are in reality claims for misdiagnosis. For example, in *Cleland*, a patient presented to a hospital's emergency room complaining of cramps and vomiting. *Cleland v. Bronson Health Care*, 917 F.2d 266, 268 (6th Cir.1990). The patient was diagnosed with influenza, the patient was treated for the flu and then discharged. *Id.* Unfortunately, that diagnosis was incorrect and the patient was actually suffering from intussusception, where a part of the intestine "telescopes" within itself. *Id.* Less than 24 hours later, the patient suffered cardiac arrest and died. *Id.* While these facts might have given rise to a negligence or malpractice claim, they did not give rise to an EMTALA claim. *Id.* at 271 (noting that the intent of EMTALA was not to "provide a guarantee of the result of emergency room treatment and discharge").

---

[2] "Health care liability action" means any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based. Tenn. Code Ann. § 29-26-101.

16

Similarly, in *Burd*, the court stated:

> EMTALA is not a substitute for state malpractice claims. A claim under § 1395dd(b) must demonstrate that a defendant has actual knowledge that an emergency medical condition exists, and the Court is not made aware of an exception for instances in which a defendant hospital's shoddy evaluation should have produced actual knowledge of an emergency medical condition, but did not.

*Burd v. Lebanon HMA, Inc.*, 756 F.Supp.2d 896, 906 (M.D.Tenn.2010). To the extent that a plaintiff argues that the hospital was negligent in failing to recognize that the plaintiff had an emergency medical condition, such an allegation does not fall under EMTALA and is reserved for state malpractice law. *Id.* "[A] hospital need provide only sufficient care, within its capability, to stabilize the patient, not necessarily to improve or cure his or her condition." *Kiser v. Jackson-Madison County Gen. Hosp. Dist., et al.*, No. 01-1259, 2002 WL 1398543 at *4 (W.D. Tenn. May 3, 2002) (copy attached as Exhibit 1).

Here, Plaintiff notes in her First Amended Complaint that her records indicate that she did not have an emergency medical condition and that she was stable upon discharge. (DE 29, PageID# 106). She vehemently disagrees with this diagnosis, suggesting that these records were "false," and claims that as a result of this alleged misdiagnosis, her injury was not treated properly. (DE 29, PageID# 107). She alleges that the Defendant "should have known" of her emergent medical condition not that Defendant had "actual knowledge" of the condition, which is required for a claim under EMTALA.

Plaintiff further complained in her deposition that she believes she should have had surgery on December 24th because her arm "was broke." (Hughes Depo., at 32). Her primary complaint against the hospital is that she was given "a pill, a sling, and sent [..] out the door." (Hughes Depo., at 46). She believes if she had had surgery on

17

December 24th, she "wouldn't have been out of work near as long" and would not "have wound up with another hospital bill." (Hughes Depo., at 46). Nowhere in Plaintiff's deposition does she complain she was medically unstable upon discharge nor that the hospital knew she had an emergency medical condition and refused to stabilize her. Plaintiff's claim is, at its heart, a medical malpractice claim for negligence, which is not sufficient to satisfy her burden of proof under EMTALA.

### B. Any potential claims for medical malpractice are barred by the statute of limitations and the Tennessee Medical Malpractice Act.

While the Plaintiff's allegations may amount to a claim for medical malpractice, Plaintiff pled no state law claims in her First Amended Complaint, and the statute of limitations for any claim for malpractice against the Defendant has passed. *See* Tenn. Code Ann. § 29-26-116. The statute of limitations for a medical malpractice claim in Tennessee is one year, meaning that Plaintiff was required to file any state law claims against Defendant by December 24, 2018– a year after her injury. *Id.*

In addition, should Plaintiff attempt to amend her First Amended Complaint to add in state law medical malpractice claims, that attempt would fail. Tenn. Code Ann. § 29-26-121 provides that any person asserting a potential claim for medical malpractice must give written notice of the potential claim to each healthcare provider who will be named as a defendant at least 60 days before the filing of a complaint based upon medical malpractice. Tenn. Code Ann. § 29–26–122 requires that, in any medical malpractice action in which expert testimony is required, the plaintiff must file with the complaint a certificate of good faith stating that the plaintiff has consulted with one or more experts who have provided a signed written statement confirming that they are competent to express an opinion in the case and that, based upon information available from medical

18

Case 2:18-cv-00057 Document 41 Filed 03/23/20 Page 18 of 20 PageID #: 165

records, there is a good faith basis to maintain the proposed medical malpractice action against the proposed defendants. Here, Plaintiff has not provided the Defendant a notice of claim or provided a certificate of good faith with her First Amended Complaint indicating that she intended to file a healthcare liability claim against this Defendant. Accordingly Plaintiff is barred from pursuing any state law claims of medical malpractice against this Defendant.

## CONCLUSION

In light of the foregoing, Defendant asks that this Court dismiss Plaintiff's First Amended Complaint with prejudice.

Respectfully submitted,

**WISEMAN ASHWORTH LAW GROUP PLC**

*/s/ Brooke McLeod Coplon*
**Thomas A. Wiseman III, #11738**
**Margaret Moore, #17492**
**Brooke McLeod Coplon, #33434**
511 Union Street, Suite 800
Nashville, TN 37219-1743
(615) 254-1877

*Attorneys for Defendant, Riverview Medical Center, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Memorandum of Law in Support of Motion for Summary Judgment has been served via the Court's electronic case filing system on this 23rd day of March, 2020:

**W. Gary Blackburn**
**Bryant Kroll**
213 Fifth Avenue North, Suite 300
Nashville, TN 37219

**Robin C. Moore**
PO Box 182
Carthage, TN 37030

*Attorneys for Plaintiff*

*/s/ Brooke McLeod Coplon*
**Brooke McLeod Coplon**